**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Southwest Fair Housing Council, | No. CV-19-00180-TUC-RM |
| Plaintiff, | **ORDER** |
| v. | |
| WG Scottsdale LLC, | |
| Defendant. | |

     Plaintiff Southwest Fair Housing Council ("Southwest" or "Plaintiff" ) brought this action pursuant to the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act ("Section 504" or "the Rehabilitation Act"), the Affordable Care Act ("ACA"), the Fair Housing Act ("FHA") and the Arizona Fair Housing Act ("AZFHA"). Plaintiff filed a Motion for Summary Judgment (Doc. 51), to which Defendant WG Scottsdale LLC ("Sierra Pointe"[1] or "Defendant") responded in opposition (Doc. 54). Defendant also filed a Motion for Summary Judgment (Doc. 49), to which Plaintiff responded in opposition (Doc. 56). The Motions will be granted in part and denied in part as follows.

. . . .

---

[1] Defendant's briefing refers to itself as "Sierra Pointe." (*See* Doc. 49.) The Court will do the same.

**I.      Summary Judgment Standard**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co. v. Fritz Co.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and to show (1) that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and (2) that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the Court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Pure questions of law, where there is no disputed issue of fact, are appropriate for summary judgment. *Schrader v. Idaho Dep't of Health & Welfare*, 768 F.2d 1107, 1110 (9th Cir. 1985). "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they

1    may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. "[T]his

2    standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure

3    50(a), which is that the trial judge must direct a verdict if, under the governing law, there

4    can be but one reasonable conclusion as to the verdict." *Id*. (internal citation omitted). In

5    its analysis, the Court must accept the nonmovant's evidence and draw all inferences in

6    the nonmovant's favor. *Id*. at 255. The Court need consider only the cited materials, but it

7    may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

8    **II.      Factual Background**

9         Plaintiff Southwest Fair Housing Council brought this action against Defendant

10   WG Campana seeking remedies for unlawful discrimination based on disability. (Doc. 51

11   at 9.) Plaintiff is a non-profit organization based in Tucson, Arizona that seeks to ensure

12   that all people, including deaf individuals, have equal access to housing in Arizona. (*Id*.)

13   Plaintiff employed testers to investigate Defendant's willingness to provide auxiliary aids

14   and services at its facilities, including American Sign Language ("ASL")[2] interpreters, as

15   part of its mission to alleviate disability discrimination in housing. (*Id*.)

16        Defendant Sierra Pointe is a is a 216-unit residential apartment complex located in

17   Scottsdale, Arizona that provides private apartments for active seniors. (Doc. 49 at 2.)

18   Sierra Pointe provides specific amenities to its residents, the cost of which is included in

19   rent, and offers licensed care services for a fee. (*Id*.) Sierra Point is licensed to provide

20   Supervisory Care, Personal Care, and Directed Care services. (*Id*.) Supervisory Care is

21   the level of care that applies to those residents who live independently and includes

22   general supervision, such as daily awareness of resident functioning and needs, cues, and

23   reminders, as well as a medication management program in which staff members remind

24   a resident to take medication and observe her doing so. (*Id*.) Supervisory Care services

25   involve no direct physical contact between staff and residents. (*Id*.) Personal Care

26   services include assistance with personal grooming, such as bathing or getting dressed.

27
_____

28   [2] ASL is a visual, three-dimensional, non-linear language, and its grammar and syntax
     differ from the grammar and syntax of English and other spoken languages. *U.S.
     E.E.O.C. v. UPS Supply Chain Solus.*, 620 F.3d 1103, 1106 (9th Cir. 2010).

(*Id*.) Directed Care services are limited to a separate 38-unit building that provides heightened monitoring and may include personal care or two-person lift assistance. (*Id*.) Sierra Pointe does not provide medical care, health care, or skilled nursing care. (*Id*.)

On August 23, 2016, Plaintiff's tester Gladys Beebe ("Beebe") visited Defendant's facility and met with Defendant's executive director, Tracy Colburn ("Colburn") and Defendant's sales director, Gwen Westhaufer ("Westhaufer").[3] (Doc. 49 at 3; Doc. 51 at 10.)[4] Beebe represented that she was visiting the facility on behalf of her deaf grandfather, Frank, who was considering relocating to Arizona. (Doc. 49 at 3.) Beebe described Frank as deaf, although he had not been born so. (*Id*.) She described him as using sign language, able to read lips, and able to read and write. (*Id*.) She described him as in "good health, fairly active, and able to drive. (*Id*.) She described him as taking heart medication. (*Id*.) Beebe also stated that she had been estranged from Frank for much of her life and that her brother Garland, who lived in Phoenix, would be the primary point of contact for him. (*Id*.; Doc. 49 at 10.)

During the tour, Westhaufer explained Sierra Pointe's various levels of care and the services associated with each. (*Id*.) Beebe indicated that Frank would live independently and might participate in the medication management program. (*Id*.) Westhaufer explained that Sierra Pointe provides a transportation service and an on-site social worker to its residents but that medical services are provided only by outside, third-party providers with whom a resident would contract directly. (*Id*.) Westhaufer explained that each resident is assessed individually prior to moving in to ensure that Sierra Pointe can provide the necessary level of care. (*Id*. at 4.)

During the tour, Beebe asked how Defendant would facilitate communication regarding financial and legal matters. (Doc. 51 at 10.) Westhaufer stated that Defendant would use a whiteboard to communicate. (*Id*.) Beebe asked if an interpreter would be

---

[3] Plaintiff's briefing spells Defendant's sales director's last name "Westhafer." (Doc. 51 at 10.) For purposes of this Order, the Court will use Defendant's spelling of the name.
[4] The entire conversation, as well as all other relevant communications, were either audio recorded or memorialized in email messages or database entries. (*See* Doc. 52 ¶¶ 25, 32, 37, 39.)

provided for the process of Frank signing a lease agreement at Sierra Pointe. (*Id.*)
Westhaufer stated that Defendant would not provide an interpreter. (*Id.*; Doc. 52 ¶ 32.)

After the tour, on September 19, 2016, an entry was placed into Defendant's
Customer Relations Management ("CRM") system that stated:

> Gladys wanted to know if APSP[5] would hire an interpreter to
> facilitate the lease signing if they selected APSP. She spoke
> with me and I suggested a white/wipe board when we initially
> toured. I spoke with our RSS and she in turn spoke with
> Gladys about our practices regarding folks with hearing
> deficits. She told G that no, we would not hire an interpreter
> and yes, we could utilize a white/wipe board and the family
> could communicate with the phone system for hearing
> impaired but that was all.

Doc. 52 ¶ 32. On that same date, Cindy Backes ("Backes"), a licensed practical nurse and
the Residential Services Supervisor ("RSS") at Sierra Pointe, emailed Beebe. (*Id.* ¶¶ 20,
32, 33.) The email stated that Defendant would not be able to supply an interpreter for
"the explanation of any financial and/or documentation paperwork." (*Id.* ¶ 34.) The email
further stated that if Frank's family wanted to utilize an interpreter, that the family would
have to make that service available for the resident and Sierra Pointe would assist with
locating a meeting room. (*Id.* ¶ 35.)

On September 22, 2016, Westhaufer left a voicemail message for Beebe stating
that the September 19, 2016 email from Backes was consistent with Defendant's
operations. (*Id.* ¶ 37.) Specifically, Westhaufer stated in the voicemail that she wanted to
make sure Beebe had received the email and wanted to know Beebe's response. (Doc. 52-
12.) She stated that she had read the email and that it was "reasonable" and "it's how our
company operates." (*Id.*)

On December 20, 2016, Plaintiff's tester Maggie Johnson ("Johnson") called
Sierra Pointe and spoke with Westhaufer. (Doc. 52-14.) In that conversation, Johnson,
posing as Beebe's sister, stated that her grandfather Frank was deaf and used ASL. (*Id.*)
Westhaufer recalled the August tour with Beebe and recalled speaking with Beebe about

---

[5] This acronym refers to the Sierra Pointe facility.

Frank. (*Id.*) Johnson asked how Frank would be able to communicate with people about "the important stuff, like his medical." (*Id.*) Westhaufer stated that the facility would provide a whiteboard. (*Id.*) Westhafer confirmed that Frank was deaf and used ASL and then stated that Defendant "would not be able to have an interpreter." (*Id.*) Westhaufer asked whether Frank was able to read and to write on a whiteboard, and Johnson confirmed. (*Id.*) In response, Westhaufer stated, "Then that would be the way we would communicate" and indicated that Colburn, who was present with her, was nodding her head "yes." (*Id.*)

Throughout her communications with Plaintiff's testers, Westhaufer expressed a willingness and desire to meet in-person with Frank and a willingness to continue to work with him and his family to determine whether Sierra Pointe was a good fit. (Doc. 49 at 2-4.)

## III.   Discussion

Defendant moves for summary judgment on three grounds. (Doc. 49.) First, Defendant argues that Plaintiff sustained no injury in fact and thus lacks standing to bring its claims. (*Id.* at 5.) Second, Defendant argues that it receives no federal funding, and thus is exempt from the requirements of the Rehabilitation Act and the ACA. (*Id.* at 7.) Third, Defendant argues that Plaintiff has provided insufficient evidence of discrimination under the FHA, the ADA, the Rehabilitation Act, and the ACA. (*Id.* at 8.) In support of its final argument, Defendant argues that there is no evidence that Plaintiff requested an interpreter or indicated that Frank could not communicate other than through ASL. (*Id.* at 12.) Defendant argues that the evidence shows that an ASL interpreter was not necessary to achieve effective communication for Sierra Pointe residents on a day-to-day basis, and that it met the requirement to provide a reasonable accommodation for effective communication and meaningful access by offering written communication and a whiteboard. (*Id.* at 13-14.) Defendant argues that it did not refuse to provide an ASL interpreter because Westhaufer never indicated that Sierra Point "would not under any circumstances" provide an interpreter. (*Id.* at 14.) Defendant

further argues that because it never interacted with the grandfather it never had the opportunity to make a final decision about whether to provide an ASL interpreter for him. (*Id*.)

Plaintiff separately moves for summary judgment on each of its four claims. (Doc. 51.) Plaintiff argues that the Court should grant summary judgment on its ADA claim because Defendant failed to make reasonable and necessary modifications or accommodations that would have provided Plaintiff equal accessibility to Defendant's facility and services. (*Id*. at 12-15.) Plaintiff argues that Defendant failed to offer a reasonable accommodation by (1) offering only a whiteboard as a means of communication about critical matters such as medical-related care and legally binding documents; (2) categorically denying Plaintiff's request for a reasonable accommodation; and (3) requiring a deaf individual to provide and pay for his own interpreter. (*Id*. at 13-16.) Plaintiff further argues that Defendant has not shown that an undue burden would prevent it from providing the requested reasonable accommodation. (*Id*. at 16-17.) Plaintiff makes analogous arguments with respect to its ACA and Rehabilitation Act claims. (*Id*. at 18-21.) Finally, Plaintiff argues that the Court should grant summary judgment on its FHA claims because Plaintiff has shown that (1) the requested interpreter was a reasonable and necessary accommodation; (2) Defendant failed to engage in the required interactive process; and (3) Defendant required a deaf individual to pay for his own interpreter. (*Id*. at 22-25.)

## A.   Standing

Defendant Sierra Pointe moves for summary judgment based upon Plaintiff Southwest's alleged lack of standing to bring its claims. (Doc. 49 at 5.) Defendant argues that Plaintiff suffered no injury in fact because, as an organizational plaintiff, it did not expend or divert any resources to redress Defendant's alleged discriminatory practices that it would not have expended in its normal course of business. (*Id*. at 5-7.) Specifically, Defendant argues that Plaintiff expended resources only on testing the Sierra Pointe facility for legal compliance and that Plaintiff did not conduct any other activities

1    or take any other actions, such as creating educational programs or awareness campaigns,

2    in response to the alleged discrimination. (*Id*. at 7.) Plaintiff argues that it satisfies the

3    Article III injury requirements for organizational standing because it can demonstrate (1)

4    frustration of its organizational mission and (2) diversion of its resources to combat the

5    particular housing discrimination in question. (Doc. 51 at 11; Doc. 56 at 10-11.)[6]

6          Fair housing organizations such as Plaintiff have standing to bring civil lawsuits

7    for discrimination uncovered by their testers. *Havens Realty Corp. v. Coleman*, 455 U.S.

8    363, 373-4 (1982). To demonstrate standing under Article III, an organizational plaintiff

9    must suffer an "injury in fact," which can consist of a tester suffering the harm intended

10   to be prevented by an anti-discrimination statute. *See id*. at 373-5.

11         Where an organization's resources are diverted to "investigating and other efforts

12   to counteract discrimination," the injury is sufficient to establish standing. *Fair Hous. of*

13   *Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002). An organization must show that it

14   suffered a "concrete and demonstrable injury to [its] activities—with the consequent

15   drain on the organization's resources—[that] constitute[d] far more than simply a setback

16   to the organization's abstract social interests." *Havens Realty Corp*. at 379. However,

17   "litigation expenses alone do not establish standing." *Fair Hous. of Marin* at 905. The

18   Ninth Circuit has recently clarified that an organization may not simply go about its

19   "business as usual" but must "alter its resource allocation to combat the challenged

20   practices." *Am. Diabetes Ass'n v. United States Dep't of the Army*, 938 F.3d 1147, 1154

21   (9th Cir. 2019). Examples of alterations to resource allocation that courts have found

22   adequate to establish standing include: creating educational and outreach initiatives,

23   expending resources to address the alleged violation that would have otherwise gone

24   toward some other aspect of the organization's purpose, and monitoring the alleged

25   violations and educating the public about them. *See id*. at 1154-55; *see also Fair Hous. of*

26   *Marin* at 904 (listing cases where organizations had standing to bring discrimination

27

28   ---
     [6] Defendant contests only Plaintiff's satisfaction of the "diversion of resources" requirement (Doc. 49 at 5-7); therefore the Court will focus its standing analysis on that issue.

claims due to diversion of resources); *Walker v. City of Lakewood*, 272 F.3d 1114, 1124 (9th Cir. 2001) (diversion of staff time is a loss for which a fair housing organizational plaintiff may recover damages).

Plaintiff claims that its damages related to diversion of resources amount to $3,428.00 and damages related to frustration of mission amount to $520,000. (Doc. 52 at ¶¶ 8-9.) Plaintiff's documentation of its expenses in connection with this action reflects Plaintiff's activities related to its investigation of Sierra Pointe as well as at least two other housing facilities. (*See* Doc. 52-1, Exh. A to PSOF.)

Plaintiff asserts that it "diverted staff time away from other projects to develop and analyze the 2016 tests." (Doc. 56 at 11; Doc. 57 ¶¶ 125-129; *see also* Exhs. O, P to Doc. 57, PCSOF.) Plaintiff asserts that its employee, Erika Hardwick ("Hardwick"), "was unable to spend adequate time analyzing other investigations due to Plaintiff's investigation of Defendant." (*Id.*) Plaintiff asserts that it reallocated grant money to fund its investigation of Defendant. (*Id.*) Plaintiff asserts that it "undertook post-investigation outreach and education efforts, including a newsletter, to inform the deaf community and other stakeholders of their rights." (*Id.*) Plaintiff asserts that it "trained its 2016 testers, paid its testers for carrying out the tests, and paid for associated costs related to the tests, such as travel expenses." (*Id.*)

Southwest points to deposition testimony from Hardwick (Doc. 57-2, Exh. O to PCSOF) and employee John Young (Doc. 57-3, Exh. P to PCSOF) to support its claimed standing. Hardwick testified that she had to begin billing her work regarding Southwest's testing and investigation of Defendant's alleged discrimination to a specific grant, rather than attributing it to a general funding source, because she was "expending so much time and energy doing it" that she "wasn't doing [her] other stuff." (Doc. 57-2 at 12.) Hardwick further testified that, due to the time she spent investigating Defendant and responding to the violations alleged in this action, she was unable to spend as much time as she otherwise would have on a project to undertake investigation of discriminatory practices in Arizona mobile home parks. (*Id.* at 15-16.)

In response to a question about whether Southwest diverted funds from another program to address the issues raised in this case, Young testified that "when something like this comes up . . . it requires us to refocus our efforts . . . to address that particular issue, as opposed to other issues that we may have identified . . . . [I]t does take resources away from other activities and other issues that we had planned on dealing with." (Doc. 57-3 at 9.) Young further testified that he directed the staff members responsible for conducting Southwest's education and outreach programs to "figure out how to best provide education and outreach to the population that is identified in the claim" and "that's what they did." (*Id*. at 10.) Young further testified that the "resources that [Plaintiff] used to deal with this particular issue were resources that would have been used to deal with other fair housing issues that we had discovered or were aware of, or . . . wanted to investigate or look into . . . [T]his investigation and all of the things have gone into it have been a pretty dramatic diversion of our resources in a way that has really required staff to refocus and do things that they weren't anticipating." (*Id*. at 11.)

The deposition testimony of Ms. Hardwick and Mr. Young establishes that Plaintiff diverted resources, including staff time and organizational funding, to address Defendant's alleged discriminatory practices. (Doc. 56 at 11; Doc. 57 ¶¶ 125-129.) This testimony is sufficient to establish "diversion of resources" for the purpose of organizational standing. Accordingly, Defendant's Motion for Summary Judgment will be denied on the issue of standing, and Plaintiff's Motion will be granted on that issue.

**B.    Rehabilitation Act and ACA Claims**

In support of its Motion for Summary Judgment on the Rehabilitation Act and ACA claims, Defendant argues that it does not receive federal financial assistance and that Plaintiff has failed to establish the federal funding nexus required to establish Defendant's liability pursuant to Section 504 of the Rehabilitation Act and the ACA. (Doc. 49 at 7.)

The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the

participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). The statute defines "program or activity," in relevant part, as "all of the operations of" "an entire corporation . . . or other private organization . . . (i) if assistance is extended to such corporation [or] private organization [] as a whole; or (ii) which is principally engaged in the business of providing [] health care, housing, [or] social services[.]"  29 U.S.C. § 794(b)(3).

The ACA provides that "an individual shall not, on the ground prohibited by . . . section 794 of Title 29 [the Rehabilitation Act], be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance[.]" 42 U.S.C. § 18116. "[P]ayments that include a subsidy constitute 'Federal financial assistance' within the meaning of the Rehabilitation Act." *Jacobson v. Delta Airlines, Inc.*, 742 F.2d 1202, 1209 (9th Cir. 1984).

The scope of Section 504 is limited to those who "actually receive federal financial assistance." *U.S. Dep't of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597, 605 (1986). Congress intended that a program or operation may avoid the non-discrimination requirements of the Rehabilitation Act (or other federal anti-discrimination statutes) by opting out of receiving federal funding. *Id.* at 505-6. Entities that merely benefit from federal funding, without actually receiving it, are not subject to the Rehabilitation Act. *Id.* at 606-7; *see also Castle v. Eurofresh, Inc.*, 731 F.3d 901, 908-9 (9th Cir. 2013). However, there is no statutory basis for a distinction between direct and indirect aid; in other words, institutions that themselves have not applied for or directly received federal funding may still be subject to non-discrimination requirements if they receive federal funds from an intermediary or third party. *See Grove City College v. Bell*, 465 U.S. 555, 563-63 (1984) (college that received federal funds from individual students was considered a recipient of federal funding although it did not directly receive federal financial assistance). Thus, a hospital's receipt of Medicare and Medicaid funds from

1   patients can subject the hospital to Section 504 of the Rehabilitation Act. *United States v.*
2   *Baylor University Medical Center*, 736 F.2d 1039, 1042-43 (5th Cir. 1984).

3          Plaintiff alleges in its FAC that Defendant qualifies as "a program or activity"
4   receiving federal financial assistance pursuant to 29 U.S.C. § 794(b) because Defendant
5   receives funding from Medicare and/or Medicaid. (Doc. 2 at ¶¶ 19-20, 95; *see also* Doc.
6   51 at 19.) Defendant has presented evidence showing that it does not receive funding
7   from Medicare and/or Medicaid. (Doc. 49 at 8; *see also* Doc. 50 at ¶¶ 5, 38.) Plaintiff has
8   not provided any controverting evidence. Therefore, the Court concludes that there is no
9   evidence to support a finding that Defendant receives federal funding in the form of
10  Medicare and/or Medicaid.

11         In its summary judgment briefing, Plaintiff relies on the contents of an
12  informational pamphlet and a public website to argue that Defendant, through its parent
13  company Atria Senior Living ("Atria"), is a recipient of federal funding via the Veterans
14  Affairs Aid and Attendance Pension. (Doc. 51 at 19; Doc. 52 ¶ 30; Doc. 56 at 12-13.)
15  According to Atria's website, "many" of its residents are "using this pension" to pay for
16  services in Atria communities. (Doc. 56 at 13.)[7] The Court assumes, without deciding,
17  that Atria's receipt of federal funding in the form of payments from veterans' benefits
18  programs is sufficient to establish a federal funding nexus on behalf of WG Campana.
19  *See Bonner v. Arizona Dep't of Corr.*, 714 F. Supp. 420, 422-23 (D. Ariz. 1989); 29
20  U.S.C. § 794(b)(3). The Court further finds that Plaintiff has presented some evidence of
21  Atria's, and thus Sierra Pointe's, receipt of federal funding in the form of veterans'
22  benefits. But the FAC does not allege that Defendant receives federal funding in the form
23  of veterans' pensions or benefits. (*See* Doc. 2.) An issue thus remains as to whether
24  Plaintiff timely disclosed its theory of Defendant's federal financial assistance and, if it
25  did not, whether it may do so now.

26         Defendant argues that Plaintiff failed to fulfill its obligation to disclose its federal
27  funding legal theory and the evidence supporting it prior to the close of discovery, and

28  ─────────────
[7]       *See also* Atria Senior Living, Veterans Benefits,
https://www.atriaseniorliving.com/family-resources/financial-planning/veterans-benefits/

1    that its failure to do so bars it from raising the theory or evidence at the summary

2    judgment stage. (Doc. 54 at 5-6.) Defendant states that discovery closed on February 28,

3    2020 and that Plaintiff's Supplemental Responses to Mandatory Discovery Responses

4    served on that date do not mention the Department of Veterans Affairs ("VA") or

5    Defendant's alleged receipt of funds from the VA, or any theory that receipt of such

6    funds would qualify defendant as a covered entity under the Rehabilitation Act or the

7    ACA. (Doc. 55, DCSOF at ¶ 55; *see also* Docs. 55-2, 55-3, Exhs. 28 & 29 to DCSOF.)

8    Defendant contends that Plaintiff did not disclose the theory that Defendant receives

9    federal funds in the form of veterans' pensions or benefits until March 5, 2020, a week

10   after discovery closed. (*Id*.; *see also* Doc. 36.)

11          In response, Plaintiff contends that its allegation in the FAC that Defendant

12   received federal funds in the form of Medicare and/or Medicaid was sufficient to timely

13   raise the theory that Defendant receives federal funds from veterans' pensions and/or

14   benefits. (Doc. 54 at 7-9.) Plaintiff further contends that it raised the VA funding theory

15   in its response to an interrogatory that was disclosed five days after the close of discovery

16   but that even if this is a late disclosure, it did not prejudice Defendant and should

17   therefore be permitted. (*Id*.)

18          The parties in this case were required to comply with the Mandatory Initial

19   Discovery Pilot Project ("MIDP"), which required them, inter alia, to state facts relevant

20   to and legal theories supporting each claim or defense during discovery. *See* General

21   Order 17-08, Section B(4). Likewise, the Federal Rules of Civil Procedure require a party

22   to disclose witnesses, documents, and other sources of information that may support a

23   claim or defense. *See* Fed. R. Civ. P. 26(a)(1).

24          Allowing a plaintiff to proceed with a new theory of recovery after the close of

25   discovery prejudices a defendant and is not permitted because a "lack of notice" on an

26   "issue central to the cause of action makes it difficult, if not impossible, for [a defendant]

27   to know how to defend itself." *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292 (9th

28   Cir. 2000). "A complaint guides the parties' discovery, putting the defendant on notice of

the evidence it needs to adduce in order to defend against the plaintiff's allegations." *Id.* "A defendant suffers prejudice if a plaintiff is allowed to proceed with a new theory of recovery after close of discovery." *Smith v. City & Cty. of Honolulu*, 887 F.3d 944, 951–52 (9th Cir. 2018) (internal citation omitted). "It is well settled in the Ninth Circuit that parties generally cannot assert unpled theories for the first time at the summary judgment stage." *Bullard v. Wastequip Mfg. Co. LLC*, 2015 WL 12766467 at *10 (C.D. Cal. April 14, 2015); *see also Navajo Nation v. United States Forest Serv.*, 535 F.3d 1058, 1080 (9th Cir. 2008) ("[O]ur precedents make clear that where, as here, the complaint does not include the necessary factual allegations to state a claim, raising such claim in a summary judgment motion is insufficient to present the claim to the district court.") A plaintiff "can avoid this bar by showing that defendants had sufficient notice of [the legal theory] prior to the close of discovery, either through the pleadings or otherwise, or by demonstrating that the court should allow an amendment of the complaint to permit him to assert the new theory at the summary judgment stage." *Bullard*, 2015 WL 12766467 at *10 (citing *Coleman*, 232 F.3d at 1291).

Plaintiff's argument amounts to an assertion that its allegation that Defendant received VA funding is not a new theory of recovery because the FAC alleges that Defendant receives federal funds and therefore Defendant had notice of the theory. (Doc. 59 at 8.) Plaintiff also argues that Defendant has suffered no prejudice. (*Id.*) Beyond Plaintiff's conclusory assertion that it raised the issue in the FAC and its unsupported argument that Defendant should have already been aware of the theory despite its non-disclosure, Plaintiff does not explain why the alleged VA funding is not a new theory of recovery. The FAC indisputably fails to allege that Defendant or Atria receives VA funding, and Plaintiff's late disclosure of this theory violates the MIDP Rules and Fed. R. Civ. P. 26(a)(1). Receipt of federal funds is an essential element of a defendant's liability pursuant to the Rehabilitation Act and the ACA. Discovery on the issue would have permitted both parties an opportunity to obtain the evidence needed to prove, or disprove, this element at trial. Like the defendants in *Coleman*, due to Plaintiff's failure to disclose

1    this theory before the close of discovery, Defendant had no opportunity to prepare a

2    defense to the allegation that it receives federal financial assistance in the form of VA

3    funds. The late disclosure of this theory of recovery is prejudicial. *See Smith*, 887 F.3d at

4    951–52. Therefore, Plaintiff cannot proceed with this theory.

5        Because Plaintiff is precluded from pursuing its theory that Defendant received

6    federal financial assistance in the form of veterans' benefits and Plaintiff has failed to

7    identify any other evidence of Defendant's receipt of federal funding, summary judgment

8    on the Rehabilitation Act and ACA claims will be granted to Defendant.

9        **C.    ADA Claims**

10       The FAC alleges that Defendant violated Title III of the ADA, 42 U.S.C. § 12181,

11   by discriminating based on disability by denying effective communication, full and equal

12   enjoyment, and a meaningful opportunity to participate in and benefit from Defendant's

13   residential and health care services. (Doc. 2 at ¶¶ 105-116.) These allegations stem from

14   Plaintiff's testing of Defendant's facility using a fictional deaf relative, which Plaintiff

15   argues resulted in a refusal by Defendant to provide a reasonable accommodation to

16   ensure effective communication by denying requests for an ASL interpreter. (Doc. 51 at

17   9-10.)

18       **1.    Applicable Law**

19       Title III of the ADA prohibits discrimination based on disability by places of

20   public accommodation. 42 U.S.C. § 12182(a). Specifically, Title III provides that "No

21   individual shall be discriminated against on the basis of disability in the full and equal

22   enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of

23   any place of public accommodation by any person who owns, leases (or leases to), or

24   operates a place of public accommodation." *Id*. Title III further provides that "[i]t shall be

25   discriminatory to exclude or otherwise deny equal goods, services, facilities, privileges,

26   advantages, accommodations, or other opportunities to an individual or entity because of

27   the known disability of an individual with whom the individual or entity is known to have

28   a relationship or association." 42 U.S.C. § 12182(b)(1)(E). Title III defines discrimination

as the failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations. 42 U.S.C. § 12182(b)(2)(A)(ii); *Martin v. PGA Tour*, 532 U.S. 661 (2001).

To prevail on an ADA claim, a plaintiff must show: (1) he or she is a disabled individual under the statute; (2) the defendant is a place of public accommodation; and (3) the defendant discriminated against the plaintiff by denying a full and equal opportunity to enjoy the services the defendant provides. *Arizona ex rel. Goddard v. Harkins Amusement Enterprises, Inc.*, 603 F.3d 666, 670 (9th Cir. 2010). To establish the final element, a plaintiff must further show that "accommodation of the handicap may be necessary to afford the [disabled] person an equal opportunity to use and enjoy the dwelling," that the accommodation is "reasonable," and that the defendant "refused to make the requested accommodation." *See Dubois v. Ass'n of Apt. Owners*, 453 F.3d 1175, 1179 (9th Cir. 2006).

The Department of Justice ("DOJ") has issued implementing regulations for Title III of the ADA as well as Technical Assistance ("TA") Manuals.[8] *See* 28 C.F.R. 36.101 *et seq.* The regulations provide that a public entity "shall furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities." 28 C.F.R. § 36.303(c). The regulations further provide that a public entity "shall take those steps that may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services." 28 C.F.R. § 36.303(a).

---

[8] An agency's interpretation of its own regulations is controlling unless it is "plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (internal citation omitted). Thus, "[t]he [Department of Justice's] interpretation of its ADA implementing regulations is entitled to controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Fortyune v. City of Lomita*, 766 F.3d 1098, 1104 (9th Cir. 2014) (internal citation and quotation omitted). "The [TA] Manual is such an interpretation, and, as such, is entitled to significant weight as to the meaning of the regulations." *Id.* (internal citation and quotation omitted).

The regulations state that "a public accommodation should consult with individuals with disabilities whenever possible to determine what type of auxiliary aid is needed to ensure effective communication, but the ultimate decision as to what measures to take rests with the public accommodation, provided that the method chosen results in effective communication." 28 C.F.R. § 36.303(c)(1)(ii). "A public accommodation shall not require an individual with a disability to bring another individual to interpret for him or her." 28 C.F.R. § 36.303(c)(2). "The type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place." 28 C.F.R. § 36.303(c)(1)(ii). The DOJ has explained that the exchange of written notes is not appropriate "when the matter involves more complexity, such as in communication of medical history or diagnoses, in conversations about medical procedures and treatment decisions, or in communication of instructions for care at home or elsewhere." *Silva v. Baptist Health S. Fla., Inc.*, 856 F.3d 824, 837 n.8 (11th Cir. 2017) (citing 28 C.F.R. pt. 36 App'x A).

"A categorical refusal to provide ASL interpreters to deaf residents fails to make a reasonable accommodation" and therefore violates the ADA.[9] *Fair Hous. Justice Ctr., Inc. v. Allure Rehab. Servs. LLC*, No. 15CV6336RJDLB, 2017 WL 4297237, at *4 (E.D.N.Y. Sept. 26, 2017). "An outright refusal to provide an interpreter, as a matter of policy, demonstrates an unwillingness to engage with the needs of deaf persons." *Id.* However, there is no bright-line rule as to when an interpreter is necessary for effective communication or when, instead, "oral communication plus gestures and visual aids or note writing will achieve effective communication." *Bircoll v. Miami-Dade Cty.*, 480

---

[9]Although this finding was made in the context of a Rehabilitation Act claim, "[t]he standards used to determine whether an act of discrimination violated the Rehabilitation Act are the same standards applied under the Americans with Disabilities Act." *Coons v. Sec'y of U.S. Dep't of Treasury*, 383 F.3d 879, 884 (9th Cir. 2004) (internal citations omitted); *see also Durand v. Fairview Health Servs.*, 902 F.3d 836, 841 (8th Cir. 2018) (case law interpreting the ADA and the Rehabilitation Act is generally used interchangeably).

F.3d 1072, 1087 (11th Cir. 2007). The standard to be applied is one of "meaningful access." *Alexander v. Choate*, 469 U.S. 287, 301 (1985) (interpreting the Rehabilitation Act to require "meaningful access" in the form of "reasonable accommodation" when necessary).

An entity violates the ADA when it fails to provide a reasonable accommodation unless the entity can demonstrate that such accommodation would create an undue burden or fundamentally alter the nature of the service being offered. 42 U.S.C. § 12182(b)(2)(A)(iii). An "undue burden" is defined as "significant difficulty or expense." 28 C.F.R. § 36.104. The ADA requires that reasonable accommodations be provided and paid for by the public accommodation unless providing them would be an undue financial and administrative burden or a fundamental alteration of the program. *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 688 (2001).

### 2.    Analysis

Both parties move for summary judgment on Plaintiff's ADA claim. Plaintiff argues that the Court should grant summary judgment in its favor on the ADA claim because it has shown that (1) Defendant is a place of public accommodation, and thus subject to the ADA's requirements; (2) Defendant failed to ensure effective communication; (3) Defendant's proposed accommodations of a whiteboard and/or note writing were not sufficient to comply with the ADA; (4) Defendant categorically denied Plaintiff's request for a reasonable accommodation in the form of an ASL interpreter; (5) Defendant required Plaintiff to pay for and provide its own ASL interpreter; and (6) no undue burden or fundamental alteration exists that would prevent Defendant from providing an interpreter. (Doc. 51 at 11-17.)

Defendant argues that the Court should grant it summary judgment on the ADA claim because the evidence, in the form of communications that took place during the tour of the WG Campana facility, does not show that discrimination occurred. (Doc. 49 at 8-14.) Defendant argues that it complied with the requirement to afford reasonable and effective accommodations to deaf persons. (*Id.*) Defendant further argues that because it

1    was never given the opportunity to interact with and evaluate the deaf grandfather in-

2    person, it could never make a final decision about whether to provide an ASL interpreter.

3    (*Id.* at 14.) Defendant does not argue that providing an ASL interpreter would unduly

4    burden it or constitute a fundamental alteration. (*See* Doc. 54 at 7.)

5        A question of fact exists as to whether Defendant's responses to Plaintiff's

6    requests for an ASL interpreter constituted a denial of a full and equal opportunity to

7    enjoy Defendant's services in violation of the ADA. Although Defendant's employees

8    Westhaufer and Backes did not immediately assent to the testers' requests for ASL

9    interpreters, and in fact repeatedly denied them, it is also not clear that their responses

10   were an "outright refusal" to make a reasonable accommodation that would have

11   provided the deaf individual with meaningful access in compliance with the ADA.

12       Defendants' employees repeatedly offered a whiteboard and/or written notes as an

13   auxiliary aid or service, and Plaintiff has not established facts showing that a whiteboard

14   and/or written notes would have been ineffective auxiliary aids. Although Plaintiff

15   contends that an interpreter is necessary for medical conversations, Plaintiff has identified

16   no specific medical services that Defendant would provide that would require an

17   interpreter. Nor has Plaintiff provided facts to demonstrate that an ASL interpreter would

18   be necessary to ensure a deaf individual equal access to and participation in the lease

19   signing process. Therefore, a question of fact exists as to whether a whiteboard, written

20   notes, or other auxiliary aids other than an ASL interpreter would have provided effective

21   communication and equal access for the deaf individual, or whether an ASL interpreter

22   was necessary to afford the deaf individual equal and meaningful access to Defendant's

23   goods and services.

24       Furthermore, it is possible that Defendant would have agreed to provide an ASL

25   interpreter had Plaintiff's testers indicated why communication in the form of a

26   whiteboard and/or written notes was not a reasonable accommodation that would have

27   provided the grandfather full access to Defendant's services. (*See* Doc. 49 at 12-13.)

28   Plaintiff's testers consistently represented to Defendant that the deaf grandfather could

read and write. (*See id*. at 13.) While Plaintiff argues that an average deaf person does not have sufficient literacy to communicate via writing (*see* Doc. 51 at 14), the Court finds that it was reasonable for Defendant to conclude, based on the information it had received about the deaf individual presented in this case, that he was sufficiently literate to engage via reading and writing in the communications necessary for him to receive Defendant's services. Furthermore, Westhaufer indicated a willingness to meet with the deaf individual and to continue to "work with" the deaf individual and his family regarding his communication needs. Westhaufer asked follow-up questions to ensure that the deaf individual could read and write before she stated that an interpreter would not be provided. *See* 28 C.F.R. § 36.303(c)(1)(ii) (an interaction with a disabled individual triggers a public accommodation's duty to "consult with [the individual] to determine what type of auxiliary aid" is necessary). It is not clear from the record before the Court that Defendant denied meaningful access to the deaf individual. A genuine dispute of material fact exists as to whether Defendants' employees' communications to the testers constituted a denial, refusal, or failure to provide reasonable accommodations that were necessary to provide the deaf individual with full and equal enjoyment, and Plaintiff's Motion for Summary Judgment on the ADA claim will be denied.

Likewise, Defendant's Motion for Summary Judgment on the ADA claims will be denied. Defendant asserts that Plaintiff "has no evidence of discrimination" (Doc. 49 at 8), but in fact, some of Defendant's employees' statements indicate a refusal to provide an ASL interpreter for the purposes of communicating with a deaf resident. Defendant argues it never unequivocally denied Plaintiff's testers an ASL interpreter. (*Id*. at 14.) However, this argument elides those portions of the record that show Plaintiff's testers requested an ASL interpreter for communications such as medical-related conversations and lease signing, and that Defendant refused those requests. If Defendant refused to provide an interpreter for those types of vital communications, it is unclear what type of communication, in its eyes, would warrant an interpreter.

Notably, Defendant's employees never stated or indicated to testers that Defendant *would* provide an ASL interpreter to the deaf individual were it necessary for his full and equal access to the Sierra Pointe facility. In fact, Westhaufer told tester Beebe that not providing ASL interpreters was how the facility "operates." Westhaufer also told the testers that the deaf individual would be responsible for procuring an ASL interpreter on his own, were one needed. Congress intended the ADA to address not just invidious or intentional discrimination based on disability, but also discrimination as a result of "thoughtlessness," "indifference," and "benign neglect." *Alexander*, 469 U.S. at 295. The record provides at least some evidence of this latter type. Accordingly, Defendant cannot establish that there is no genuine dispute of material fact as to whether it failed to make a necessary reasonable accommodation to ensure effective communication and equal enjoyment of its services.[10] The trier of fact will have to determine whether or not Defendant's responses to Plaintiff's requests for an ASL interpreter constituted a refusal or failure to provide a reasonable accommodation in violation of the ADA. Accordingly, both Defendant's and Plaintiff's Motions for Summary Judgment will be denied on the ADA claim.

### D.      FHA and AZFHA Claims

The parties agree that the requirements of the FHA and the AZFHA are the same. (*See* Doc. 51 at 21, n.8; Doc. 54 at 12; Doc. 59 at 11.); *see also City of Tempe v. State*, 364, 351 P.3d 367, 371 (Ariz. App. 2015); 42 U.S.C. § 3601 *et seq.*

#### 1.      Applicable Law

Under the FHA, unlawful discrimination includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford [a disabled] person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). The Ninth Circuit has "repeatedly interpreted this language as imposing an 'affirmative duty' on landlords and public agencies to

---

[10] Defendant cites multiple out-of-circuit cases to support its arguments that Plaintiff has failed to establish the elements of an ADA claim. (*See* Doc. 54 at 7, 11; Doc. 49 at 14-15.) These cases are not controlling, and Defendant has not cited a controlling case mandating summary judgment in its favor.

reasonably accommodate the needs of disabled individuals." *McGary v. City of Portland*, 386 F.3d 1259, 1261 (9th Cir. 2004). This duty includes the responsibility to provide and pay for reasonable accommodations that are not unduly burdensome. *See Giebeler v. M & B Assocs.*, 343 F.3d 1143, 1148-52 (9th Cir. 2003) (internal citations and quotations omitted) ("[T]he history of the FHA clearly establishes that Congress anticipated that landlords would have to shoulder certain costs involved, so long as they are not unduly burdensome."); *see also* H.R. REP. No. 100-711 at 25 ("it [is] illegal to refuse to make reasonable accommodation in rules, policies, practices, or services if necessary to permit a person with [a disability] equal opportunity to use and enjoy a dwelling. The concept of 'reasonable accommodation' has a long history in regulations and case law dealing with discrimination on the basis of [disability].") Courts "often rely on and apply the case law and regulations interpreting the ADA and the Rehabilitation Act in interpreting the 'accommodation' of disabled individuals under the FHA." *Montano v. Bonnie Brae Convalescent Hosp., Inc.*, 79 F. Supp. 3d 1120, 1127, n.3 (C.D. Cal. 2015) (citing *Giebeler*, 343 F.3d at 1149 (courts interpret the FHA's accommodation provisions with the FHA's goal of "protect[ing] the right of handicapped persons to live in the residence of their choice in the community" in mind) (internal citations omitted)).

To prevail on a claim under 42 U.S.C. § 3604(f)(3), a plaintiff must prove all of the following elements: "(1) that the plaintiff or his associate is handicapped within the meaning of 42 U.S.C. § 3602(h); (2) that the defendant knew or should reasonably be expected to know of the handicap; (3) that accommodation of the handicap may be necessary to afford the handicapped person an equal opportunity to use and enjoy the dwelling; (4) that the accommodation is reasonable; and (5) that defendant refused to make the requested accommodation." *See* 42 U.S.C. § 3604(f)(3)(B); *Dubois v. Ass'n of Apartment Owners of 2987 Kalakaua*, 453 F.3d 1175, 1179 (9th Cir. 2006) (listing elements required to prevail on FHA claim); *see also United States v. California Mobile Home Park Mgmt. Co.*, 107 F.3d 1374, 1380 (9th Cir. 1997) (listing prima facie elements of FHA claim).

Reasonable accommodations on behalf of disabled persons "may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). The FHA requires "reasonable accommodations necessary to meet the disability-created needs of a disabled person, so that the disabled person may enjoy the same [housing] opportunities enjoyed by nondisabled persons." *Giebeler*, 343 F.3d at 1150 (9th Cir. 2003) (citing *U.S. Airways v. Barnett*, 535 U.S. 391 (2002)). The *Barnett* Court held that reasonable accommodations to achieve equal opportunity may require preferential treatment for disabled persons, because facially neutral policies or practices, even if not invidiously discriminatory, may result in treatment that denies disabled persons equal access and opportunity. *Id*. at 1150. The Seventh Circuit has held that "[w]hether the requested accommodation is necessary requires a "showing that the desired accommodation will affirmatively enhance a disabled plaintiff's quality of life by ameliorating the effects of the disability." *Dadian v. Vill. of Wilmette*, 269 F.3d 831, 838 (7th Cir. 2001) (internal citation omitted).

"Ordinarily, an accommodation is reasonable under the [FHA] when it imposes no fundamental alteration in the nature of the program or undue financial or administrative burdens." *Giebeler*, 343 F.3d at 1157 (internal citation and quotation omitted). "The question whether a particular accommodation is reasonable 'depends on the individual circumstances of each case' and 'requires a fact-specific, individualized analysis of the disabled individual's circumstances and the accommodations that might allow him to meet the program's standards.'" *Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir. 2002) (citing *Wong v. Regents of the Univ. of Cal.*, 192 F.3d 807, 818 (9th Cir.1999)). The plaintiff bears "the initial burden of producing evidence that a reasonable accommodation was possible." *Id*. Thereafter, the burden shifts to the defendant "to produce rebuttal evidence that the requested accommodation was not reasonable." *Id*.

The FHA requires a housing provider to engage in an interactive process with a tenant or resident with a disability. *Montano*, 79 F. Supp. 3d at 1128 ("Defendant's conduct, by failing to engage in the interactive process relating to the nature and scope of

plaintiff's requested accommodations, also constitutes a violation of the FHA.") The *Montano* Court cites *Jankowski Lee & Assocs. v. Cisneros*, 91 F.3d 891, 895 (7th Cir. 1996), *as amended*, for the proposition that a housing provider who fails to engage in an interactive process in order to determine the scope and nature of the requested accommodation violates the FHA. "If a landlord is skeptical of a tenant's alleged disability or the landlord's ability to provide an accommodation, it is incumbent upon the landlord to request documentation or open a dialogue." *Id.*

## 2.    Analysis

Both parties move for summary judgment on the FHA claims. Plaintiff argues that the Court should grant it summary judgment on the FHA claims because its request for an ASL interpreter was both reasonable and necessary, Defendant failed to engage in an interactive process, and Defendant required a deaf individual to pay for an interpreter. (Doc. 51 at 21-25.) Defendant argues that the Court should grant it summary judgment on the FHA claims for the same reasons it sought summary judgment on the ADA claim, namely, that Plaintiff has not provided evidence of disability discrimination. (Doc. 49 at 8-14.)

As discussed above, the issues in contention include whether the requested accommodation of an ASL interpreter was (1) necessary; (2) reasonable, and (3) whether Defendant refused to make the requested accommodation. *Dubois*, 453 F.3d at 1179. Also in dispute is whether Defendant engaged in an interactive process to determine the scope and nature of the requested accommodation. *Montano*, 79 F. Supp. 3d at 1128. The record shows that neither Plaintiff nor Defendant has conclusively demonstrated material facts that would entitle them to summary judgment as a matter of law on the FHA claims.

For the reasons set forth above in Section C(2), a question of fact exists as to whether Defendant's responses to Plaintiff's requests for an ASL interpreter constituted a denial of a full and equal opportunity to enjoy Defendant's services in violation of the FHA. The record shows that Defendant's employees offered a whiteboard and/or written notes as reasonable accommodations for the deaf individual's disability, and Plaintiff has

not demonstrated facts to conclusively show that such accommodations were insufficient to afford equal and meaningful access. The record further shows that Westhaufer was willing to meet with the deaf individual and to continue to "work with" the deaf individual and his family regarding his communication needs. Westhaufer also asked follow-up questions to ensure that the deaf individual could read and write before she stated that an interpreter would not be provided. Accordingly, Plaintiff cannot show as a matter of law that Defendant failed to engage in the interactive process required by the FHA.

Likewise, as set forth above in Section C(2), Defendant cannot show as a matter of law that it did not violate the FHA. Its employees denied Plaintiff's tester's requests for an ASL interpreter on multiple occasions. Furthermore, Defendant's employees never stated or indicated to testers that Defendant *would* provide an ASL interpreter to the deaf individual were it necessary for his full and equal access to the Sierra Pointe facility. To the contrary, Westhaufer told tester Beebe that not providing ASL interpreters was how the facility "operates" and that the deaf individual would be responsible for procuring an ASL interpreter on his own, were one needed. The trier of fact will have to determine whether or not Defendant's responses to Plaintiff's requests for an ASL interpreter constituted a refusal or failure to provide a reasonable accommodation in violation of the FHA. Accordingly, both Defendant's and Plaintiff's Motions for Summary Judgment will be denied on the FHA claim.

**IT IS ORDERED**:

(1) Defendant's Motion for Summary Judgment (Doc. 49) is **granted in part and denied in part** as follows:

    a. Summary judgment is **denied** as to the issue of standing.

    b. Summary judgment is **granted** as to the Rehabilitation Act claim.

    c. Summary judgment is **granted** as to the Affordable Care Act claim.

    d. Summary judgment is **denied** as to the Americans with Disabilities Act claim.

     e.  Summary judgment is **denied** as to the Fair Housing Act and Arizona Fair Housing Act claims.

(2) Plaintiff's Motion for Summary Judgment (Doc. 51) is **granted as to the issue of standing**. Plaintiff's Motion for Summary Judgment is **otherwise denied**.

Dated this 8th day of March, 2021.


_____
Honorable Rosemary Márquez
United States District Judge